UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

ELSON BLANC,

                     Plaintiff,

      -against-

SAGEM MORPHO, INC., KEITH
PARADISE, KATHLEEN VETTER, and
ALLYSON THOMAS,

                  Defendants.
--------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**07-CV-3085 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

      <u>Pro se</u> Plaintiff Elson Blanc ("Plaintiff") brings this employment discrimination action against Defendants Sagem Morpho, Inc. ("SMI"), Keith Paradise ("Paradise"), Kathleen Vetter ("Vetter"), and Allyson Thomas ("Thomas") (collectively, "Defendants").[1] Plaintiff alleges discrimination on the basis of race, color, and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) <u>et seq.</u> ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law, N.Y. Exec. L. § 290 <u>et seq.</u> ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 <u>et seq.</u> ("NYCHRL"). (Second Am. Compl. (Docket Entry #24).) He also alleges retaliation in violation of these statutes. (<u>See id.</u>) Before the court is Defendants' Motion for Summary Judgment. (Docket Entry #50.) For the reasons below, the Motion is GRANTED.

## I.    FACTUAL BACKGROUND

      The court considers the following facts undisputed.[2]

---

[1] The court notes that until June 23, 2008, Plaintiff was represented by counsel, who filed the original complaint and two amended complaints on Plaintiff's behalf. (Docket Entries #16, 24.)

[2] Plaintiff's submissions in opposition to Defendants' Motion do not comply with Local Civil Rule 56.1. Pursuant to Local Civil Rule 56.2, Defendants provided Plaintiff with notice of the consequences of failing to comply with Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1, which included copies of

Plaintiff, a black male of Haitian national origin, commenced employment with SMI in December 2000. (Def. 56.1 Statement ¶ 2 (Docket Entry #52).) SMI is a company that manufactures and sells biometric security technologies, including fingerprint, iris, and facial recognition products and services. (Id. ¶ 1.) Throughout his tenure at SMI, Plaintiff worked as a customer support engineer ("CSE") in SMI's Long Island City office. (Id. ¶ 2.) As a CSE, Plaintiff was responsible for providing hardware and software to the Office of Temporary and Disability Assistance ("OTDA"), one of SMI's clients. (Id. ¶ 13.) His job required responding to OTDA service calls and conducting preventive maintenance. (Id.) Plaintiff was also on SMI's rotation to perform on-call services for the New York Police Department ("NYPD"), to which SMI provided Livescan hardware. (Id. ¶¶ 13, 24.)

During Plaintiff's tenure at SMI, there were fourteen CSEs who worked on the OTDA and NYPD contracts. (Id. ¶ 10.) Of these CSEs, one was Hispanic, three were black, two were Asian, and eight were white. (Id. ¶ 10.) The CSEs assigned to OTDA were based in Albany or Long Island City. (Id. ¶ 16.) In the Long Island City office, there were generally two CSEs assigned to the OTDA contract, but one resigned in January 2006, leaving Plaintiff as the only CSE assigned to OTDA in the Long Island City office. (Id.)

Defendant Vetter, who is white, became Plaintiff's immediate supervisor in October 2005. (Id. ¶ 4.) She supervised the Long Island City CSEs from Albany. (Id. ¶ 14.) According to Plaintiff, Vetter went to the Long Island City office and called the CSEs much more

---

those rules. Plaintiff did not submit a response to Defendants' 56.1 Statement as required by Local Civil Rule 56(b). Plaintiff's memorandum of law contains a "statement of facts" and an unsigned, unsworn letter to the court, both of which attempt to dispute some of Defendants' factual assertions and cite to Plaintiff's voluminous exhibits.

While this court is entitled under Local Rule 56.1(c) to deem admitted all facts set forth in Defendants' 56.1 Statement, because Plaintiff is pro se, the court declines to do so here. See Melendez v. DeVry Corp., No. 03-CV-1029 (NGG) (LB), 2005 WL 3184277, at *2 (E.D.N.Y. Nov. 29, 2005). This court has reviewed the entire record submitted by the parties to determine whether there are disputed issues of material fact. See id. The court will deem admitted only those facts in Defendants' Rule 56.1 Statement that are supported by admissible evidence and are not controverted by other admissible evidence in the record.

frequently than did his previous supervisors.  (Decl. of Gregory B. Reilly ("Reilly Decl.") Ex. 1, Deposition of Elson Blanc ("Blanc Dep.") 332-33 (Docket Entry #54).)  Unlike Plaintiff's previous supervisors, Vetter held regular weekly meetings with the CSEs and required them to submit weekly status reports.  (Def. 56.1 Statement ¶ 15.)  In July 2006, Vetter hired James Vincent, a black male of Haitian national origin, to replace the CSE who had left in January.  (Id. ¶ 14.)  At the time of Plaintiff's termination in December 2006, there were seven CSEs in the New York metropolitan area, three white and four black, including Plaintiff.  (Id. ¶ 10.)

### A.    Training

SMI provided all the Long Island City CSEs, including Plaintiff, with "A-plus" computer training.  (Id. ¶ 50.)  Plaintiff started asking for additional training in 2003.  (Blanc Dep. 61.)  In April 2006, Plaintiff again requested additional training.  (Id. ¶ 51.)  At that time, because the other CSE servicing OTDA had resigned, Plaintiff was "the only person in OTDA account, handling the whole city, all five boroughs."  (Blanc Dep. 110, 143.)  Vetter did not recommend Plaintiff to Human Resources for training, and explained to Plaintiff that she needed his services during the week.  (Def. 56.1 Statement ¶ 52; Pl. Ex. R (Docket Entry #60).)  Vetter asked Plaintiff whether he would be able to participate in training at a later date.  (Def. 56.1 Statement ¶ 52; Pl. Ex. R.)  Plaintiff stated that he wanted to participate in Saturday training classes, and Vetter asked him to provide information regarding available weekend courses.  (Def. 56.1 Statement ¶ 53; Pl. Ex. R.)  Vetter subsequently learned that weekend computer networking classes were not offered through the program Plaintiff requested.  (Def. 56.1 Statement ¶ 54.)

At his deposition, Plaintiff testified that three white employees – Chris Sanders ("Sanders"), Defendant Paradise, and Myles Vredenburg ("Vrendenburg") – received additional training.  (Id. ¶ 55.)  It undisputed that Sanders received LINUX training.  (Id.)  Unlike Plaintiff,

however, Sanders needed to be familiar with the LINUX operating system for his work on behalf of SMI's client.  (Id. ¶ 58.)  Moreover, Sanders did not work out of the Long Island City office.  (Id.)  As for Paradise, Plaintiff testified that he "heard from a co-worker" that Paradise received training (Blanc Dep. 71), but Plaintiff could not identify what training Paradise received, nor has he provided any evidence disputing Paradise's declaration that he did not receive any training except for the A-plus training provided to all CSEs (Def. 56.1 Statement ¶ 57).[3]  In addition, Paradise did not work on the same contract as Plaintiff or for the same supervisor.  (Id.)  As for Vrendenburg, he was not a CSE (Reilly Decl. Ex. 7, Decl. of Keith Paradise ("Paradise Decl.") ¶ 5), and in any event, Plaintiff could not identify what training, if any, Vrendenburg received (Def. 56.1 Statement ¶ 56).  In addition, while Vrendenburg worked in the Long Island City office, he did not work on the same contracts as Plaintiff or for the same supervisor.  (Id.)

### B.    Salary

Plaintiff asserts that he was paid less than similarly situated white employees.  Plaintiff testified at deposition that he heard from Paradise that Paradise received a five percent pay increase, a higher increase than Plaintiff received.  (Blanc Dep. 88-90.)  Other than Paradise, however, Plaintiff did not identify any other CSE who received a higher pay increase or who earned a higher salary than he did.  (Id.)  He asserted, however, that CSEs were "underpaid." (Id. at 89, 65.)

Plaintiff's base salary was $39,800.  (Def. 56.1 Statement ¶ 48.)  Of the fourteen CSEs assigned to the OTDA and NYPD contracts during Plaintiff's tenure at SMI, five white CSEs also earned a base salary of less than $40,000, with one earning less than $35,000.  (Id.)  Three white CSEs earned more than $40,000, one of whom earned more than $45,000.  (Id.)  The two

---

[3] Because Plaintiff's testimony about what he heard from a co-worker is hearsay, it is admissible to show Plaintiff's belief that Paradise received training, but it is not admissible for the truth of whether Paradise received training.  See Fed. R. Evid. 802; Fed. R. Evid. 803(3).

black CSEs other than Plaintiff both earned more than $45,000.  (Id.)  One Asian CSE earned more than $50,000, the other Asian CSE earned approximately $40,000, and the Hispanic CSE earned more than $45,000.  (Id.)

### C.    Issues Regarding Plaintiff's Job Performance

While Plaintiff's previous performance reviews by his former supervisors were positive, Vetter noticed deficiencies in Plaintiff's performance beginning in early 2006.  (Def. 56.1 Statement ¶ 17.)  According to Vetter, Plaintiff was "unresponsive and his whereabouts were often unknown."  (Vetter Decl. ¶ 13.)  In early 2006, Vetter "attributed Plaintiff's deficiencies to the fact that he was the lone CSE servicing OTDA sites in the metropolitan area," so she "initially gave Plaintiff some leeway in terms of his performance deficiencies."  (Id. ¶¶ 13-14.)  After she hired Vincent in July 2006 to join Plaintiff on the OTDA account, however, Plaintiff's performance did not improve.  (Id. ¶ 14.)  According to Vetter, when Plaintiff conducted biannual preventive maintenance in July 2006, he did not visit clients at the scheduled times and did not accurately complete the requisite paperwork.  (Id. ¶ 16.)  Vetter spoke to Plaintiff about his performance.  (Id.)  The record does not indicate whether this warning occurred before or after Vincent was hired.

On October 2, 2006, Plaintiff sent Vetter an e-mail at 5:02 a.m., stating that "we might be taking calls from home" because the carpet in the office was being replaced.  (Pl. Ex. D.)  The next day, Vetter responded via e-mail, stating that "[y]ou need to receive my approval in advance if you wish to work from your home.  You were not authorized to work from home today and therefore will need to utilize personal time for the number of hours you did not perform work reflecting the OTDA AFIS contract."  (Id.)  Vetter's e-mail further provided, "Keith [Paradise] was actually looking for you to help move things around.  It was not expected that this was a

reason to stay home.  Jimmie, Paul, Keith and Myles were there helping while doing their normal work as required."  (Id.)  Later in the evening on October 3, Plaintiff e-mailed Vetter, stating that he had been in the office on October 2 and 3, and that when Paradise called him to say that he was waiting for him, he notified Paradise that he was en route to a service call and then returned to the office where he helped with the moving.  (Id.)

On October 16, 2006, Plaintiff took a vacation day without permission.  (Def. 56.1 Statement ¶ 21.)  Although SMI's company policy required thirty days' notice for vacation days, Vetter required only two weeks' notice, but required employees to enter their requests via a computer system.  (Id.)  Plaintiff violated Vetter's policy by entering his request for a vacation day with less than twenty-four hours' notice and taking the vacation day before it was approved. (Id.)  When asked at his deposition why he did not request the vacation day two weeks earlier, Plaintiff responded, "[t]here was no particular reason for it."  (Blanc Dep. 117.)  Plaintiff testified, however, that Vetter had told him that "any time you need a day, just put it in writing, give me a phone call, which I did."  (Id. at 110.)

Vetter sent Plaintiff a written warning regarding this violation, stating that "requesting a vacation day on a Sunday, one day prior to taking the day off is not sufficient enough time for me to evaluate the day you requested, moreover not sufficient time for me to approve the day." (Blanc Dep. 108 & Ex. 3.)  The warning further provided: "You also did not send me an email notification or provide me with a phone call as you had done for the previous days you requested off."  (Id.) It stated, "[i]n the future, please provide me with two (2) weeks notice for any pre-scheduled vacation days.  If you are unable to provide me with two weeks notice, please make sure you contact me either by email or phone to let me know you have requested time off." (Id.)

The next documented performance violation concerned Plaintiff's failure to respond to a service call from the NYPD on October 22, 2006. (Def. 56.1 Statement ¶ 27.) SMI requires CSEs to respond to NYPD service calls within fifteen minutes. (Id. ¶ 26.) One reason for SMI's short response time is that the NYPD uses SMI's digital scanners for fingerprinting as part of its booking process; if the equipment needs to be repaired, suspects cannot be booked. (Id.) Vetter sent a letter dated November 6, 2006 to Defendant Thomas, SMI's Director of Human Resources, explaining that a representative from the NYPD communicated that a "system event" resulted in "our customer feeling [SMI] had provided poor service as our on-call CSE was considered non-responsive." (Id. ¶¶ 5, 27.) The letter noted that "[a]fter . . . a thorough investigation of the incident, several errors were identified throughout the procedure. While these procedural errors have been addressed, the problem with Elson's lack of response and/or not following up with users in appropriate timeframes seemed to be a recurring problem." (Id.) Paradise, the lead CSE in the Long Island City office, spoke to Plaintiff about this incident. (Id. ¶¶ 3, 28.) Plaintiff testified that he told Paradise that when he received the call for service, he referred the call to another employee who was in charge of that account, because "it wasn't a Livescan issue." (Blanc Dep. 128.)

On October 29, 2006, Plaintiff was again unresponsive to a service call regarding scanners for the NYPD. (Def. Statement ¶ 28.) Plaintiff was working on-call that day when Paradise attempted to reach him on his cell phone. (Blanc. Dep. 128-29.) Plaintiff's wife answered Plaintiff's phone and told Paradise that Plaintiff would return the call in an hour. (Id. at 129.) Plaintiff testified that on that date, he was giving a talk in Brooklyn and had told his wife to "take care of all the incoming calls for me." (Id. at 130.) Plaintiff testified that his wife picked up calls to Plaintiff's work cell phone "a lot." (See id. at 136.) Plaintiff has provided no

evidence disputing his failure to respond in a timely fashion, but testified that there were no scanners in stock to replace the scanner that had been the subject of the call.  (Blanc Dep. 129.)

On November 2, 2006, Paradise removed Plaintiff from the NYPD rotation because Plaintiff "failed to meet the NYPD's standards."  (Def. 56.1 Statement ¶ 30.)  On November 7, Plaintiff sent an e-mail to Walt Scott, his former supervisor, asking to be placed back on the NYPD on-call list, conceding that "I know they [sic] have been times where I missed a call here and there but overall I tried my best to pick up all the livescan calls."  (Vetter Decl. Ex. B.)

On December 4, 2006, Plaintiff failed to report for his assigned shift, also missing the department's weekly meeting.  (Def. 56.1 Statement ¶ 32.)  Plaintiff failed to request this day off, and in fact had left the country.  (Id.)  When Vetter e-mailed Plaintiff to inquire about his whereabouts, Plaintiff responded with an e-mail stating, "my phone died on me while I was on the road.  I got home at 10 pm last night due to bad weather from canada [sic]. . . .  I was outside the us [sic]."  (Id.)

On December 13, 2006, Vetter went to the Long Island City office to speak with Plaintiff regarding his performance problems and to give him a memorandum dated December 11, 2006 entitled "Notice of Performance Deficiency" ("Notice").[4]  (Id. ¶ 33.)  Copies of the Notice were sent to Thomas and placed in Plaintiff's personnel file.  (Id.)  The Notice described in detail the incidents on October 16, October 22, October 29, and December 4 – but did not mention Plaintiff's alleged absence from work on October 2 or 3 – and reiterated policies regarding

---

[4] Plaintiff has submitted two compact discs containing audio files, which he asserts are recordings of his conversation with Vetter on December 13, 2006 (Pl. Ex. K) and his termination meeting on December 22, 2006 (Pl. Ex. L).  In his memorandum of law, Plaintiff asserts that the audio files "set the record straight," but he does not cite to any particular statements or portions of the audio files.  (Pl. Opp. 4-5 (Docket Entry #60).)  The court has listened to the audio files in their entirety and concludes that nearly all of the content is inaudible, with a few intervals of barely audible content.  In any event, the court could not ascertain any content contradicting Defendants' evidence regarding the meetings on December 13 and 22, 2006.  To the contrary, in an audible portion of Exhibit K, a female voice can be heard describing SMI's policy regarding vacation days and Plaintiff's failure to comply with the policy, referring to the December 11 Notice, stating that everything in the document was supported by customer complaints, and asking whether there were any questions.  A male voice stated that he did not have any questions.

procedures for taking vacation days and expectations regarding availability for on-call technicians, noting that an additional stipend is provided for on-call rotations. (Id.) Regarding the NYPD contract, the Notice noted that "[d]ue to your actions, the workload for the remaining support staff is necessarily increased and impacts our ability to respond to our customers in a timely manner." (Id.) Regarding the OTDA contract, the Notice recounted Plaintiff's failure in July 2006 to perform preventive maintenance for the OTDA according to the schedule and complete the required paperwork, noting that "[t]hese types of administrative issues caused great concern" with the OTDA project manager and resulted in the creation of a "Preventive Maintenance Corrective Action Plan." (id.) The Notice also mentioned Plaintiff's unexcused absences. (Id.) In particular, it provided:

> Your failure to meet Sagem Morpho and the NYS OTDA's performance expectations is unacceptable. Your performance and commitment to the company and our customers must improve in order to retain your position . . . Your failure to improve your performance will result in further action up to and including the possibility of termination of your position. . . . [A]ny further occurrence of a no show/no call for your reported shift will be considered a voluntary resignation and will result in the termination of your employment.

(Id.)

### D.  Plaintiff's Complaints to Paradise and Thomas

Plaintiff testified at deposition that in September 2006, he asked Paradise whether he thought there was a discriminatory motive respecting training. (Blanc. Dep. 311; see also Paradise Decl. ¶ 7 (attesting that Plaintiff "casually asked" whether he thought there was a discriminatory motive as to why Plaintiff's request for training was denied).) Plaintiff has not disputed Defendants' evidence that Paradise did not tell anyone at SMI about that conversation. (Paradise Decl. ¶ 7; Vetter Decl. ¶ 31; Reilly Decl. Ex. 8, Decl. of Allyson Thomas ("Thomas Decl.") ¶ 10.)

On October 17, 2006, Plaintiff e-mailed Thomas, who is white, stating that he wanted to submit a complaint against Vetter, because he had applied for tuition reimbursement and Vetter was "trying to sabotage my reputation with the company." (Pl. Ex. C1.) The e-mail stated that Vetter had sent e-mails with accusations regarding Plaintiff's vacation days "with no ground proof." (See id.) On October 17, Thomas responded, notifying Plaintiff that she would follow up on Plaintiff's e-mail, but noted that Plaintiff had not submitted a "complete packet of information" for tuition reimbursement, without which his request could not be considered. (See id.) The e-mail attached the application materials and instructed Plaintiff to e-mail or call Thomas with any questions. (Id.) Regarding the issue of vacation days, Thomas wrote that she had verified that Plaintiff had, on October 15, requested a vacation day for October 16, and that submitting a vacation request on a Sunday for the next day "does not allow sufficient time for planning or adequate notice to your manager." (Id.) She noted: "[w]hile we understand that extenuating circumstances do arise from time to time, it is expected that an employee contact their manager and discuss the situation and the need for time off if unable to follow the required guidelines. This does not appear to be the case." (Id.) Plaintiff responded via e-mail on October 18, writing, "[t]hank you Allyson [Thomas] for everything, I will make sure I send in the requested information." (Pl. Ex. E1.)

On December 12, 2006, Plaintiff again e-mailed Thomas, stating that two months after Paradise falsely claimed Plaintiff was not in the office, presumably referring to the events of October 3, 2006, Plaintiff was taken off the NYPD Livescan contract. (Pl. Ex. F.) According to Plaintiff, Paradise said that Plaintiff "should know what's coming next" because CSEs are supposed to be on call. (Id.) Plaintiff's e-mail asked Thomas to make sure that his employee file

was accurate and stated that he wished to know whether it contained "anything forfeiting because this looks too personal now." (Id.)

On December 13, Plaintiff again e-mailed Thomas, stating that he received a written warning from Vetter "for stuff that [he] did not agree with." (Pl. Ex. F.) He referenced his previous e-mail to Thomas regarding Paradise's accusation that Plaintiff missed work, and stated that Paradise and Vetter were trying to "build up a file against me." (Id.) The e-mail contained no allegation or mention of discrimination. (See id.) It also noted, "after that incident where I complained for both Keith Paradise and Kathleen [Vetter] I have been pounded with numerous accusations one after the other." (Id.)

Thomas responded via e-mail and asked Plaintiff for more specific details. (Blanc Dep. Ex. 26.) She wrote, "I need to know specifically what your allegations are and why you disagree with the document that was presented to you . . . by Ms. Vetter and Mr. Paradise." (Id.) First, she addressed her earlier e-mail exchange with Plaintiff on October 17 and October 18 regarding Plaintiff's tuition reimbursement application. (Id.) She reiterated that while Plaintiff had expressed that he felt that Vetter "was attempting to sabotage" his reputation, she had told him in her previous e-mail that Vetter had nothing to do with the application not yet being approved and that Plaintiff had not submitted the application materials as required. (Id.) Her e-mail indicated that she had sent Plaintiff the materials again, had not received the completed application materials, and that the tuition committee could not consider the request until it had the materials. (Id.) Second, she addressed the incident regarding Plaintiff's unexcused absence on October 16, repeating what she had written in the previous e-mail that Plaintiff had not provided sufficient notice to Vetter. (Id.) Finally, the e-mail mentioned Plaintiff's inquiry regarding the October 3 incident and noted, "I do not have a full understanding of that event but it was not mentioned in

the document presented to you . . . ." (Id.) The e-mail additionally stated, "[t]here have been additional incidents, including removal from the NYCPD call rotation due to non-responsiveness to calls when on the rotation, that even absent the event on October 3rd, raise cause for concern." (Id.) The e-mail asked Plaintiff to provide specific clarification on the matters of concern.

By e-mail dated December 14, 2006, Plaintiff responded to Thomas's request for clarification, referencing his previous e-mails on October 17, December 12, and December 13. (Blanc Dep. Ex. 26.) Plaintiff asserted that he had requested professional training and development from Jim Goldberg, a previous supervisor, noting that "I was constantly given a reason as to why I could not attend." (Id.) He stated, "I have observed the same pattern with Ms. Vetter where my attempts to further my professional development with the company has [sic] gone absolutely nowhere." (Id.) The e-mail stated, "[s]hould I come to believe that this is a form of discrimination, since the employees I have observed that have received professional training and development do not look like me?" (Id.)

### E. Plaintiff's Complaint to Representative Owens's Office

Plaintiff asserts that he complained to his Congressperson, Representative Major R. Owens, but the record does not reveal the date or content of the complaint. Plaintiff and Defendants both submitted a fax that appears to have been sent on December 15, 2006 from Donna Gatlin, a staffer to Representative Owens, to SMI with the notation, "[a]s per our conversation/Elson Blanc," and attaching copies of some of the e-mail correspondence between Plaintiff and Thomas in December 2006. (Pl. Ex. W; Blanc Dep. Ex. 24.) Plaintiff also submitted an e-mail he received from Donna Gatlin dated December 22, 2006, which states that he had "contacted Congressman Owens['s] office and asked for his assistance in resolving an employment matter, which consists of wrongful disciplinary actions" and that Gatlin had spoken

with Thomas on December 15, 2006 regarding the complaint of "wrongful disciplinary action."

(Pl. Ex. H.)

### F.     Plaintiff's EEOC Intake Questionnaire

On December 15, 2006, Plaintiff submitted an "intake questionnaire" to the Equal

Employment Opportunity Commission ("EEOC"), alleging that SMI discriminated against him

on account of his race and national origin and subjected him to retaliation.  (Pl. Ex. F.)  Plaintiff

attached two handwritten pages to the questionnaire, in which he asserted that he was denied

training due to his race, that human resources did not advocate for him to receive training, and

that he was retaliated against because "someone in the office complained of smoking cigarettes

inside the office."  (Id.)  The EEOC questionnaire that Plaintiff submitted provides in bold,

underlined language, "[f]illing out this form does not constitute filing a charge."[5]  (See id.)

### G.     Plaintiff's Subsequent Job Performance and Termination

On Tuesday, December 19, 2006, Vetter received an e-mail from Bill Carlson, a System

Specialist Trainer at SMI, describing a complaint from a client about Plaintiff.  (Vetter Decl. Ex.

D.)  The e-mail informed Vetter that SMI's client had called to notify SMI that Plaintiff arrived

late to a service call on a Friday evening, and when the client arrived Monday morning, the work

had not been completed as expected.  (Vetter Decl. Ex. D.)  The e-mail stated that Plaintiff could

not be reached and the work remained incomplete.[6]  (Id.)

---

[5] Defendants have submitted a response from the EEOC to a Freedom of Information Act request indicating that the EEOC has no record of a charge filed in December 2006 by Plaintiff against SMI.  (Reilly Decl. Ex. 5.)  As discussed below, however, whether the EEOC considered Plaintiff's Intake Questionnaire a formal "charge" is irrelevant to the resolution of Defendants' Motion.

[6] Plaintiff has provided evidence that he signed the visitors' log at the site at 8:55 a.m. on Monday, December 18, 2006, but this evidence demonstrates only that he was at that building at that time; it does not contradict Defendants' evidence that Vetter was informed that a customer had complained that the work was incomplete as of December 18.  (See Vetter Decl. Ex. D.)  Plaintiff has also submitted unsworn letters from two "site operators" named Marsha Angela Cusaac and Lisa Bradley, whose employers are not identified.  (Pl. Ex. J.)  These letters state that Plaintiff completed the work on Tuesday, December 19.  (See id.)  As unsworn statements, these letters are inadmissible in opposition to summary judgment, but even if they were admissible, they do not

On December 22, 2006, Vetter went to the Long Island City Office and notified Plaintiff in person that his employment was terminated. (Def. 56.1 Statement ¶ 37.) At that time, she provided Plaintiff with a termination letter from Human Resources. (Id. ¶ 38.) The termination decision was made by Defendant Thomas in consultation with Defendant Vetter. (Id.) At no point during the meeting did Plaintiff allege that he was the victim of discrimination or retaliation of any kind. (Id. ¶ 39.) Plaintiff has not provided evidence to dispute Defendants' assertion that no one at SMI was aware of any complaint to the EEOC made by Plaintiff prior to Plaintiff's termination. (Thomas Decl. ¶ 10.)

### H.     Plaintiff's Subsequent Contacts with the EEOC and This Lawsuit

By letter dated January 3, 2007, an investigator from the EEOC notified Plaintiff that his complaint dated December 15, 2006 had been received and asked him for further information regarding his race/national origin, the race and national origin of his supervisor and the other CSEs, and whether his position required the type of training he wished to acquire. (Pl. Ex. F.) That letter directed Plaintiff to submit that information "if you still wish for your complaint to be evaluated." (Id.) On March 2, 2007, Plaintiff filed a formal charge with the EEOC alleging discrimination based on race, color, and national origin, as well as retaliation. (Def. 56.1 Statement ¶ 40.) The EEOC dismissed the March 2, 2007 charge on May 8, 2007. (Id. ¶ 43.) Plaintiff, then represented by counsel, filed this action on July 25, 2007, but never served Vetter and Thomas. (Id. ¶ 44.)

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact. See Fed. R. Civ. P. 56(c). The burden to show the absence of a genuine factual dispute falls on the

---

contradict Defendants' evidence that SMI received a complaint regarding Plaintiff's conduct on December 15 and 18.

moving party. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970). A dispute regarding a material fact is genuine if the evidence is such that a reasonable finder of fact could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, the court must "view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments . . . ." <u>Weyant v. Okst</u>, 101 F.3d 845, 854 (2d Cir. 1996) (citations omitted).

Summary judgment is properly granted when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Abramson v. Pataki</u>, 278 F.3d 93, 101 (2d Cir. 2001) (<u>quoting</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)). While a non-moving party must do more than show "some metaphysical doubt as to the material facts," <u>Matsushita Electric Industrial Company, Ltd. v. Zenith Radio Corporation</u>, 475 U.S. 574, 586 (1986), "all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial," <u>McClellan v. Smith</u>, 439 F.3d 137, 144 (2d Cir. 1996) (citation omitted)). Where a party opposes a motion <u>pro se</u>, the court must construe his or her briefs liberally. <u>See</u>, <u>e.g.</u>, <u>Ferran v. Town of Nassau</u>, 471 F.3d 363, 369 (2d Cir. 2006).

The Second Circuit has repeatedly emphasized "the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." <u>Holcomb v. Iona Coll.</u>, 521 F.3d 130, 137 (2d Cir. 2008) (citations omitted). Given that direct evidence of an employer's discriminatory intent will only rarely be available, "affidavits and depositions must be carefully scrutinized for circumstantial

proof which, if believed, would show discrimination." <u>Gallo v. Prudential Residential Servs.,</u> <u>Ltd. P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," and courts are not to "treat discrimination differently from other ultimate questions of fact." <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir. 2001) (quotation omitted). Even in the discrimination context, a plaintiff must provide more than conclusory allegations to survive a motion for summary judgment. <u>Holcomb</u>, 521 F.3d at 137.

## III. DISCUSSION

Plaintiff alleges that he was subjected to discrimination in violation of Title VII, 42 U.S.C. § 1981, the NYSHRL, and the NYCHRL because: (1) he was denied training provided to white employees; and (2) he was paid less than white employees. He also alleges that he was terminated in retaliation for complaining about discrimination. Defendants seek summary judgment, contending that Plaintiff cannot establish a prima facie case of discrimination or retaliation, nor can has he provided evidence showing that Defendants' proffered reasons for their actions are a pretext for discrimination or retaliation. (Def. Mem. 1 (Docket Entry #51).) For the reasons below, the court grants summary judgment to Defendants.

### A. Plaintiff's Title VII Claims

The court evaluates Plaintiff's discrimination claims against SMI before turning to the retaliation claims.[7]

#### 1. Discrimination

"At the summary-judgment stage, properly exhausted Title VII claims are ordinarily analyzed under the familiar burden-shifting framework of <u>McDonnell Douglas Corporation v.</u>

---

[7] In addition to SMI, Plaintiff names as defendants three individuals – Paradise, Vetter, and Thomas. Because individuals are not subject to liability under Title VII, <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 221 (2d Cir. 2004), Plaintiff's Title VII claims against Defendants Paradise, Vetter, and Thomas are dismissed.

Green, 411 U.S. 792 (1973), and its progeny." Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008). Under this framework, a plaintiff bears the burden of establishing a prima facie case. To do so, he or she must demonstrate: "(1) that he [or she] belonged to a protected class; (2) that he [or she] was qualified for the position he [or she] held; (3) that he [or she] suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Sassaman v. Gamache, --- F.3d ---, No. 07-2721-cv, 2009 WL 1424433, at *3 (2d Cir. May 22, 2009) (quoting Holcomb, 521 F.3d at 138). The Second Circuit has held that the "plaintiff's burden of establishing a prima facie [Title VII case] is de minimis." Id. (citing Abdu-Brisson, 239 F.3d at 467).

To demonstrate a prima facie case of disparate-treatment discrimination under Title VII, a plaintiff must demonstrate that defendants "treated him [or her] less favorably than a similarly situated employee outside his [or her] protected group" under circumstances giving rise to an inference of discrimination. Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000). While the question of whether two employees are similarly situated is ordinarily a question of fact for a jury, Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003), "where a plaintiff seeks to make out her prima facie case by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that she shared sufficient employment characteristics with that comparator so that they could be considered similarly situated," McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001). While the employee with whom a plaintiff seeks to compare him- or herself "must be similarly situated in all material respects," Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997) (emphasis added), "a plaintiff is not obligated to show disparate treatment of an identically situated employee." McGuinness, 263 F.3d at 53-54. That is, "where a plaintiff seeks to establish the minimal prima facie case by making

reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." Id. at 54.

If a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate "some legitimate, non-discriminatory reason" for its employment action. Holcomb, 521 F.3d at 138. "If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination." Id. The ultimate burden of persuasion "remains at all times with the plaintiff." Id. (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). To avoid summary judgment, a plaintiff "is not required to show that the employer's proffered reasons were false or played no role in the employment discrimination, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." Holcomb, 521 F.3d at 138 (internal quotation marks and citation omitted); see 42 U.S.C. § 2000e-2(m) (providing that "an unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice.").

### a. Training

Training is a benefit of employment that receives protection under Title VII. 42 U.S.C. § 2000e-2d; Lopez v. Metropolitan Life Ins. Co., 930 F.3d 157, 160-61 (2d Cir.), cert. denied, 502 U.S. 880 (1991) (analyzing Title VII disparate-treatment claim regarding company on-the-job training practices).[8] It is undisputed that all CSEs, including Plaintiff, received A-plus computer

---

[8] Some district courts in this circuit have found that a failure to provide training, by itself, is not an "adverse employment action" under Title VII. See Santiago v. City of New York, No. 05-CV-3668 (RRM)(VVP),

training.  Plaintiff alleges that black CSEs were passed over for training opportunities and were thus treated differently from white CSEs, whom Plaintiff claims received additional training. (Second Am. Compl. ¶¶ 24, 26, 29.)  Under the standards articulated in <u>Graham</u> and <u>McGuinness</u>, the court concludes that Plaintiff has failed to provide evidence from which a finder of fact could conclude that any similarly situated employee received training that Plaintiff did not receive. Plaintiff thus cannot establish a prima facie case of discrimination with respect to training.[9]

As noted above, Plaintiff testified at his deposition that three white employees – Sanders, Paradise, and Vrendernburg – received additional training.  (Def. 56.1 Statement ¶ 55.)  The undisputed evidence regarding these employees, however, does not support a finding that these employees were similarly situated to Plaintiff <u>and</u> received training not provided to Plaintiff. First, regarding Sanders, who received LINUX training, it is undisputed that Sanders's duties for SMI involved working with LINUX servers, whereas Plaintiff's work did not involve LINUX operating systems.  (Def. 56.1 Statement ¶ 58.)  No finder of fact could conclude that Sanders's situation was "sufficiently similar" to that of Plaintiff's – that is, "similar in all material respects" – because Sanders needed LINUX training for his work, while it is undisputed that Plaintiff did not.  Second, with respect to Defendant Paradise, regardless of whether he and Plaintiff could be found to be similarly situated, Plaintiff has not provided any admissible evidence to dispute

---

2009 WL 935720, at *9 (E.D.N.Y. Mar. 31, 2009) (dismissing employment discrimination claim because, <u>inter alia</u>, "plaintiff has not established that failure to train her was an adverse employment action"); <u>Hill v. Rayboy-Brauestein</u>, 467 F. Supp. 2d 336, 352 (S.D.N.Y. Nov. 9, 2006) ("When an employee cannot show material harm from a denial of training, such as a failure to promote or a loss of career advancement opportunities, there is no adverse employment action.").  Here, given that Plaintiff's prima facie case fails for failure to show a similarly situated employee who received training not provided to Plaintiff, the court makes no determination as to whether Plaintiff experienced an "adverse employment action" under Title VII.

[9] Defendants urge that "in order to be similarly situated, other employees must have reported to the <u>same supervisor as plaintiff</u>."  (Def. Mem. 6.)  There is no such requirement in the case law.  <u>See</u> <u>McGuinness</u>, 263 F.3d at 53 (holding that the magistrate judge "misread[] <u>Shumway</u>" to mean that "another employee cannot be similarly situated to a plaintiff unless the other employee had the same supervisor, worked under the same standards, and engaged in the same conduct.").

Paradise's declaration that he received no training other than the A-plus training provided to Plaintiff. See, e.g., Zolodnek v. Worldwide Flight Servs., Inc., No. 02-CV-2030 (DLI) (LB), 2006 WL 4100886, at *7 (E.D.N.Y. Aug. 28, 2006), report and recommendation adopted by 2007 WL 680778, reconsideration denied, 2007 WL 2177047 (stating that plaintiff must demonstrate, inter alia, that the defendant employer "offered training to its other employees"). Third, assuming the truth of Plaintiff's testimony that Vrendenburg received some unspecified additional training, the court concludes that no finder of fact could conclude that Vrendenburg was similarly situated to Plaintiff, because Vrendernburg was not a CSE, nor did he work on the same account as Plaintiff. (Paradise Decl. ¶ 5.) In sum, Plaintiff has not provided evidence from which a finder of fact could conclude that he was "treated less favorably than a similarly situated employee" under circumstances giving rise to an inference of discrimination. Graham, 230 F.3d at 39. Plaintiff thus fails to establish a prima facie case of discrimination with respect to training.

### b.    Compensation

Plaintiff alleges that he and other black CSEs were paid less than similarly situated white CSEs.[10] (Second Am. Comp. ¶¶ 27, 28.) To support his claim, he testified at deposition that: (1) Defendant Paradise said that he received a five percent pay increase, a higher increase than Plaintiff received; and (2) the CSEs were paid below market rates. (Blanc Dep. 89.) Defendants assert that Plaintiff cannot establish a prima facie case of pay discrimination because the undisputed evidence demonstrates that Plaintiff's salary was commensurate with that of the other CSEs who worked on the OTDA and NYPD contracts. (Def. Mem. 9.) For the reasons below, the court concludes that Plaintiff has not established a prima facie case of pay discrimination.

---

[10] Defendants assert that Plaintiff has waived his claim of pay discrimination because he did not address it in his opposition to Defendants' Motion for Summary Judgment. (Def. Reply Mem. 5 (Docket Entry #61).) None of the cases cited by Defendants in support of their position, however, involved pro se plaintiffs. The court will not deem Plaintiff's claim waived.

First, as to Plaintiff's assertion regarding Paradise's pay increase, Plaintiff has not provided evidence from which a jury could conclude that Paradise is a similarly situated employee. Moreover, Plaintiff has provided no admissible evidence that Paradise earned a higher salary than Plaintiff or received a greater pay increase than Plaintiff did. See Johnson v. County of Nassau, 480 F. Supp. 2d 581, 598 (E.D.N.Y. 2007) (noting that the plaintiff had "not produced any evidence such as payroll records, to substantiate his claim that he received lower pay raises"). Even if the court assumes the truth of Plaintiff's hearsay testimony that Paradise received a 5% increase in pay, while Plaintiff received a 2% increase (Blanc Dep. 88-90), Plaintiff has not provided any evidence from which a finder of fact could conclude that he and Defendant Paradise are similarly situated for the purpose of comparing their salaries or pay raises. It is undisputed that Paradise, the "lead" CSE, is the CSE in the Long Island City Office with the longest tenure, and began working at SMI two years before Plaintiff was hired. (Vetter Decl. ¶ 3; Def. 56.1. Statement ¶ 2; Paradise Decl. ¶ 3.) Plaintiff has not provided any evidence from which a jury could conclude that he and Paradise are similarly situated, because it is undisputed that Paradise has more experience and is the "lead" CSE. See, e.g., Graham, 230 F.3d at 39 (explaining that to raise an inference of discrimination, a plaintiff must "show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.").

As for Plaintiff's contention that black CSEs were paid less than white CSEs, Plaintiff's conclusory statement is insufficient to raise a genuine issue of material fact. See, e.g., Abato v. New York City Off-Track Betting Corp., No. 03-CIV-5849 (LTS), 2007 WL 1659197, at *6 (S.D. N.Y. June 7, 2007) (noting that conclusory statements that "similarly situated younger women" were treated differently, in the absence of any "specific information" concerning those

individuals, were "insufficient to present a genuine issue of material fact"). Moreover, Plaintiff

does not dispute Defendants' evidence concerning the base salaries of the fourteen CSEs

assigned to the OTDA and NYPD accounts during the relevant time period: five white CSEs

earned a base salary under $40,000 (with one earning under $35,000), and all black CSEs other

than Plaintiff earned over $45,000. (Def. 56.1 Statement ¶ 49.) Plaintiff's salary of $38,500 was

generally commensurate with that of other CSEs assigned to the OTDA and NYPD accounts.

Plaintiff has provided no evidence that he or any other black CSE earned a lower salary than a

similarly situated white CSE, or that black CSEs as a group were paid less than white CSEs.

Plaintiff's additional assertion that CSEs were paid below market rates is irrelevant to a

determination of discrimination under Title VII. In sum, Plaintiff has not demonstrated a prima

facie case of pay discrimination.

## 2. Retaliation

Title VII prohibits discrimination against an employee who "has opposed any practice

made an unlawful employment practice . . . or because he has made a charge, testified, assisted,

or participated in any manner in an investigation, proceeding, or hearing under" the auspices of

that statute. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, a plaintiff

must show: "[1] participation in a protected activity known to the defendant; [2] an employment

action disadvantaging the plaintiff; and [3] a causal connection between the protected activity

and the adverse employment action." Richardson v. Comm'n on Hum. Rts. & Opportunities,

532 F.3d 114, 122 (2d Cir. 2008) (alterations in original) (citation omitted). A plaintiff's initial

burden to establish a prima facie is de minimis. See, e.g., Woodman v. WWOR-TV, Inc., 411

F.3d 69, 76 (2d Cir. 2005). In determining whether a plaintiff has satisfied this initial burden, the

court's role in evaluating a motion for summary judgment is "to determine only whether

proffered admissible evidence would be sufficient to permit a rational find of fact to infer a retaliatory motive." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).

If a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action; if the employer meets that burden, the burden shifts back to the plaintiff to show pretext. Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87, 94-95 (2d Cir. 2001). To do so, the plaintiff must "establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001).

### a. Prima Facie Case

Here, Plaintiff alleges that he was terminated in retaliation for engaging in the following activities: (1) he complained to Defendant Paradise in September 2006; (2) he filed an EEOC charge in December 2006; and (3) he complained to SMI's Human Resources department. The court concludes that Plaintiff's e-mail to Thomas in Human Resources on December 14, 2006 constitutes protected activity of which the employer was aware. Plaintiff's prima facie case fails, however, because Plaintiff has not provided evidence from which a finder of fact could infer a nexus between his protected activity and termination.

For a plaintiff's conduct to constitute participation in a protected activity, it is enough that he has made "informal protests of discrimination, including making complaints to management." Gregory v. Daly, 243 F.3d 687, 700-01 (2d Cir. 2001) (citation omitted). "Careless and uncounseled accusations of discrimination," however, "are not necessarily protected." Lapsley v. Columbia Univ.-Coll. of Physicians & Surgeons, 999 F. Supp. 506, 542 (S.D.N.Y. 1998) (citations omitted). While complaints about conduct clearly prohibited by Title VII "need not mention discrimination or use particular language, . . . ambiguous complaints that

do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity." Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007). This is because "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that plaintiff's opposition was directed at conduct prohibited by Title VII." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998). Therefore, an employee's complaint to an employer about unfair treatment in general is insufficient to constitute protected activity. See Aspilaire v. Wyeth Pharm., Inc., --- F. Supp. 2d ---, No. 07-CV-0952 (WCC), 2009 WL 988648, at *16 (S.D.N.Y. Mar. 30, 2009) (citing Ezekwo v. New York City Health & Hosps. Corp., 940 F.2d 775, 781 (2d Cir. 1991)). "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." Id. (citation omitted). Even if a plaintiff believes that he or she is the victim of discrimination, "an undisclosed belief of such treatment will not convert an ordinary employment complaint into a protected activity." Id.

To establish a prima facie case of retaliation, however, a plaintiff need not prove that the conduct about which he or she complained actually violated Title VII. Rather, "[a] plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he [or she] can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (internal quotation marks omitted). Whether a plaintiff's belief is reasonable must be "assessed in light of the totality of the circumstances." Galdieri-Ambrosini, 136 F.3d at 292.

First, Plaintiff asserts that he engaged in protected activity when he asked Paradise in September 2006 whether he thought there was a discriminatory motive respecting training. (Blanc. Dep. 311; Paradise Aff. ¶ 7.) Defendants assert that Plaintiff's conversation with Paradise is similar to that in Lapsley, in which the district court held that the plaintiff's statement to her supervisor, "I would hate to feel that I was being discriminated against . . . I could see that I was being treated differently as opposed to other whites and Hispanic employees," did not constitute protected activity. 999 F. Supp. at 524. The court found that the plaintiff's "passing remark" did "not even rise to the level of an accusation . . . At best, the casual comment suggests that she felt discrimination had occurred, but she did not explain the basis of her feeling, and, in any event, the topic was quickly dropped." Id. at 524-25. Here, even if Plaintiff believed that he was the victim of discrimination, the court finds that, as in Lapsley, Plaintiff's remark to Paradise does not rise to the level of protected activity, because it could not be construed to put the employer on notice that Plaintiff was complaining of discrimination based on a protected category. Id.; see also Gibson v. State of Conn. Judicial Dep't Court Support Servs. Div., No. 05-CV-1296 (JCH), 2007 WL 1238026, at *9 (D. Conn. Apr. 25, 2007) (relying on Lapsley to conclude that the plaintiff's mere use in an e-mail of the word "discriminatory," without more, was not protected activity, given that the e-mail's purpose was to complain about being falsely accused of failure to follow a directive).

Second, Plaintiff asserts that he engaged in protected activity by filing an EEOC "charge" on December 15, 2006; Defendants assert as a factual matter that SMI did not become aware of any complaint to the EEOC until March 2007, when it received Plaintiff's formal charge. (Thomas Decl. ¶ 10.) The intake questionnaire that Plaintiff submitted to the EEOC in December 2006 does not, by its terms, constitute a "formal charge." Under certain

circumstances, however, an EEOC intake questionnaire may constitute a "charge" for purposes of determining <u>when</u> a plaintiff activated the administrative process, although the EEOC "is not required to treat every completed Intake Questionnaire as a charge." <u>See</u> <u>Fed. Express Corp. v. Holowecki</u>, 128 S. Ct. 1147, 1155, 1159 (2008); <u>see also</u> <u>Morrow v. Metropolitan Transit Auth.</u>, No. 08-CV-6123 (DLC), 2009 WL 1286208, at *5-6 (S.D.N.Y. May 8, 2009) (discussing the test in <u>Holowecki</u> as used to determine whether an intake questionnaire should be construed as a charge). Here, regardless of whether Plaintiff's December 15, 2006 intake questionnaire could be construed as a "charge," it is protected activity, but Plaintiff has provided no evidence that SMI was aware of it. While a plaintiff need only establish "general corporate knowledge that the plaintiff has engaged in the protected activity," <u>Gordon v. New York City Board of Education</u>, 232 F.3d 111, 116 (2d Cir. 2000), there is no evidence that <u>anyone</u> at SMI knew about Plaintiff's intake questionnaire prior to Plaintiff's termination. Thus, Plaintiff's intake questionnaire cannot constitute "protected activity known to the employer" as required for a prima facie case. <u>See</u> <u>Morrow</u>, 2009 WL 1286208, at *8 (concluding that reference to discrimination in EEOC intake questionnaire did not constitute protected activity linked to plaintiff's discharge when there was no assertion that the employer learned that the plaintiff had submitted a questionnaire to the EEOC several months prior to constructive discharge, "much less that [the employer] learned the contents of that questionnaire").

Third, Plaintiff asserts that his e-mail to Thomas on December 14, 2006, constitutes protected activity. That e-mail, the last in a series of e-mails between Plaintiff and Thomas beginning on October 17, 2006, referred to Plaintiff's unsuccessful attempts to obtain training and stated "[s]hould I come to believe that this is a form of discrimination, since the employees I have observed that have received professional training and development do not look like me?"

(Blanc Dep. Ex. 26.) Looking at Plaintiff's e-mail exchange with Defendant Thomas regarding Plaintiff's vacation days, training requests, and alleged unexcused absences from work, Plaintiff's rhetorical question is the first and only reference to "discrimination." This statement nonetheless constitutes protected activity, however, because it puts the employer on notice that Plaintiff believed that he was subjected to unlawful discrimination regarding training on the basis of his race. While Defendants compare Plaintiff's statement to the "passing remark" in Lapsley, the court disagrees. In Lapsley, the plaintiff did not explain the basis of her "feeling" that discrimination had occurred. 999 F. Supp. at 524-25. Here, however, it is clear from Plaintiff's assertion that those who received training "do not look like me" that Plaintiff believed that he was subject to discrimination based on race or color. Moreover, whereas the topic of discrimination was "quickly dropped" in Lapsley, id. at 525, this was not the case here, as Plaintiff sent a copy of his e-mail to Thomas to Representative Owens's office, which faxed it to Thomas at SMI.[11] (Pl. Ex. W.) The court thus concludes that Plaintiff's December 14, 2006 e-mail to Thomas was protected activity known to SMI.

Plaintiff still cannot establish a prima facie case, however, because he cannot show a nexus between the protected activity and his termination. Plaintiff engaged in protected activity approximately a week before his termination. While "[a] plaintiff may establish causation indirectly by showing [the protected activity] was closely followed in time by the adverse employment decision," Cioffi v. Averill Park Central School District Board of Education, 444 F.3d 158, 168 (2d Cir. 2006), "where timing is the only basis for a claim of retaliation, and

---

[11] Plaintiff also contends that his complaint to Representative Owens's office constitutes protected activity. The record shows that on December 15, 2006, Representative Owens's office sent Thomas copies of her e-mail exchange with Plaintiff, and that Representative Owens's staffer, Gatlin, told Thomas that Plaintiff had complained about "wrongful disciplinary actions." (Pl. Exs. W, H.) Because the court determines that Plaintiff's December 14, 2006 e-mail to Thomas constitutes protected activity, Plaintiff's complaint to Representative Owens's office, which included that e-mail, was similarly protected, and Gatlin's faxing of the e-mail to Thomas makes Plaintiff's complaint to Representative Owens known to SMI.

gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise," <u>Slattery</u>, 248 F.3d at 95. Here, timing is the only basis for Plaintiff's claim of retaliation, and gradual adverse employment actions began long before Plaintiff's complaints. In particular, Plaintiff's December 28, 2005 annual performance evaluation from Vetter, while generally satisfactory, noted the following: Plaintiff's weekly status reports "are never received on time," Plaintiff "tends to go on his own schedule," "often times his manager cannot contact him during various times during the day," and "he receives both verbal and written communication and direction, but does not provide what is asked for in the timeframe or format required." (Pl. Unmarked Exhibit.) Vetter also warned Plaintiff about his performance deficiencies in July 2006, five months before Plaintiff engaged in any protected activity. (Vetter Decl. ¶ 16.) Therefore, Plaintiff's prima facie case fails because he cannot establish causation.

    **b.**    **SMI's Legitimate, Non-Retaliatory Reason for Plaintiff's Termination and Plaintiff's Failure to Provide Evidence of Pretext**

Out of an abundance of caution, the court notes that even if Plaintiff could establish a prima facie case of retaliation, his retaliation claim cannot survive summary judgment because Defendants have met their burden of articulating a legitimate, non-retaliatory reason for Plaintiff's termination, which Plaintiff cannot establish is pretextual.

Defendants easily meet their burden of articulating a legitimate, non-retaliatory reason for Plaintiff's termination: unsatisfactory performance. On December 13, 2006, Vetter gave Plaintiff a formal Notice of Performance Deficiency that detailed the incidents on October 16, October 22, October 29, and December 4 and reiterated policies for regarding vacation days and

expectations regarding on-call technicians. (Def. 56.1 Statement ¶ 33.) It also cited Plaintiff's failure in July 2006 to perform preventive maintenance for the OTDA and noted Plaintiff's unexcused absences. (Id.) This document warned Plaintiff that any further "no show/no call" for his reported shift would result in termination of his employment. (Id.) On Tuesday, December 19, 2006, Vetter received an e-mail from Bill Carlson, a System Specialist Trainer with SMI, informing her that SMI's client had called to notify SMI that Plaintiff arrived late to a service call on a Friday evening, and when the client arrived Monday morning, the work had not been completed as expected. (Vetter Decl. Ex. D.) The e-mail stated that Plaintiff could not be reached and the work remained incomplete. (Id.) Plaintiff was terminated several days after this incident.

Viewing the record in the light most favorable to Plaintiff, Plaintiff has not provided evidence from which a finder of fact could conclude that SMI's reasons for terminating Plaintiff are a pretext for unlawful retaliation; indeed, Plaintiff acknowledged numerous instances of his unsatisfactory job performance. For example, he conceded that there were times he "missed a call here and there" (Vetter Decl. Ex. B), and testified at deposition that on October 29, 2006, while he was being paid by SMI for being on call, he was giving a speech in Brooklyn and had asked his wife to "take care of all the incoming calls," and "[s]he did that a lot." (Blanc Dep. 130, 136.) Nor does Plaintiff dispute that he failed to report for his shift on December 4, 2006, and that he failed to request the day off. (Def. 56.1 Statement ¶ 32.) While Plaintiff disputes some of Defendants' claims regarding particular instances of unsatisfactory performance, his admissions regarding other instances cited by Defendants in the Notice of Deficiency demonstrate that his performance was objectively unsatisfactory. See McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997) (noting that "[t]he record, including [plaintiff's] own

admissions and assertions, establishes indisputably that . . . [plaintiff's] performance was not satisfactory" where the plaintiff "did not dispute even half of the negative evaluations" and offered "rationalizations for his deficiencies rather than demonstrations of any genuine issue of material fact").

Finally, the fact that Plaintiff previously received satisfactory evaluations from his supervisors prior to Vetter cannot in itself raise an inference of pretext. Davis v. Oyster Bay-East, No. 03-CV-1372 (SJF), 2006 WL 657038, at *11 (E.D.N.Y. Mar. 9, 2006) (noting that "[t]he mere fact that Plaintiff had a better relationship with or received better evaluations from previous supervisors does not, on its own, raise an inference of discrimination" and citing cases). Moreover, a new manager is "allowed to appraise an employee's work according to his or her own expectations, even if those expectations are contrary to a prior manager's expectations." Orisek v. Am. Inst. of Aeronautics & Astronautics, 983 F. Supp. 185, 191 (S.D.N.Y. 1996) (citation omitted). In Orisek, for example, the district court found that a plaintiff's negative evaluation after seventeen years of positive evaluations did not in itself raise an inference of pretext, because the new evaluation was under a new manager with "new expectations." Id. at 191. The court found that the negative evaluation was "not necessarily inconsistent with Orisek's past positive reviews. Even if it were, however, such inconsistency does not support a finding of pretext." Id. Here, it is undisputed that Vetter was a more demanding supervisor than Plaintiff's previous supervisors; she called and visited the CSEs in the Long Island City office more frequently than did the previous supervisors, held regular weekly meetings with the CSEs, and required the submission of weekly status reports. (Blanc Dep. 332-333; Def. 56.1 Statement ¶ 15.) That Vetter found Plaintiff's work unsatisfactory does not, in itself, raise an inference of unlawful retaliation against Plaintiff.

In sum, Plaintiff's claim of retaliation fails because he cannot establish a prima facie case or demonstrate that Defendant's reason for his termination was pretextual. The court thus grants summary judgment to SMI on Plaintiff's discrimination and retaliation claims under Title VII.

## B.    Plaintiff's Additional Claims

Plaintiff's Complaint also raises claims under 42 U.S.C. § 1981, the NYSHRL, and the NYCHRL. These claims are analyzed under the same-burden shifting framework used to evaluate discrimination and retaliation claims under Title VII. See, e.g., Liburd v. Bronx Lebanon Hosp. Ctr., No. 07-Civ.-11316 (HB), 2009 WL 900739, at *3 (S.D.N.Y. Apr. 3, 2009) (applying same analysis to Title VII and Section 1981 claims); Salamon v. Our Lady of Victory Hosp., 514 F.3d 217, 226 n.9 (2d Cir. 2008) ("[W]e typically treat Title VII and NY[S]HRL discrimination claims as analytically identical"); Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006) ("[R]etaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII."); Bielinski v. Hotel Pierre, 591 F. Supp. 2d 541, 550 n. 101 (S.D.N.Y. 2008) (applying the same analysis to claims under NYSHRL, NYCHRL, and Title VII claims). Because Plaintiff has not demonstrated a prima facie case of discrimination or retaliation under Title VII, his claims against all of the Defendants under Section 1981, the NYSHRL, and NYCHRL similarly fail.[12]

---

[12] While the case law demonstrates that courts apply the Title VII analysis to evaluate claims under Section 1981, NYSHRL, and NYCHRL, the NYCHRL's legislative history and amendments note that the NYCHRL is to be "more liberally construed" than federal and state antidiscrimination laws. See, e.g., Williams v. New York City Housing Authority, 61 A.D.3d 62, 74-75 (N.Y. App. Div. 1st Dep't 2009). The court has been unable to find any authority under New York law that would allow Plaintiff's claims under the NYCHRL to survive summary judgment, however, given Plaintiff's failure to provide evidence that raises even an inference of discrimination or retaliation.

The court also notes that Plaintiff never served Defendants Vetter or Thomas (Vetter Decl. ¶ 3, Thomas Decl. ¶ 3), despite being represented by counsel when each of his three complaints in this action was filed. Defendants answered the Complaint on behalf of Defendant Vetter and raised this defense in its answers. (Docket Entries #6, 22, 25.) Defendants' Motion for Summary Judgment is Defendant Thomas's first responsive pleading in this case. While the court grants summary judgment to Defendants on the merits, it further notes that it lacks personal jurisdiction over Defendants Vetter and Thomas.

In addition to the claims raised in his Second Amended Complaint, Plaintiff's memorandum of law purports to assert claims under the Equal Pay Act and the Age Discrimination in Employment Act. (Pl. Opp. 2, 6, 7, 9, 10.) Plaintiff's memorandum and supporting papers do not provide any facts supporting claims under these statutes. In any event, because these claims were not raised in Plaintiff's original Complaint or two subsequent Amended Complaints, all of which were filed by Plaintiff's former counsel, the court will not consider them here.

**IV.     CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED. The Clerk of the Court is directed to close this case.

SO ORDERED.

   /s/ Nicholas G. Garaufis

NICHOLAS G. GARAUFIS

United States District Judge

Dated: Brooklyn, New York
      June <u>25</u>, 2009